IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FRIENDSHIP VILLAGE OF MILL CREEK, NFP D/B/A GREENFIELDS OF GENEVA, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 15 CV 7797 ) ) Magistrate Judge Michael T. Mason |
| LEND LEASE (US) CONSTRUCTION, Inc., | ) ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is defendant Lend Lease Construction's motion to dismiss count III of plaintiff Friendship Village of Mill Creek's complaint (dkt. 19). For the reasons set forth below, defendant's motion is granted.

**I.  Background**

The following facts are taken from plaintiff's amended complaint (dkt. 34) and are accepted as true for the purposes of the pending motion to dismiss.[1]  *See Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009).  In 2010, Friendship Village entered into a contract with Lend Lease for the construction of a continuing care retirement community consisting of 147 independent living units, 51 assisted living units, 26 memory support assisted living units, 43 skilled nursing units, and related common areas.  (Am. Compl. ¶ 5.)  Construction began in September 2010.  (*Id.* at ¶ 6.)

---

[1] Friendship Village recently sought and was granted leave to amend its complaint to clarify certain facts it learned during its investigation in a companion case.  The causes of action pled in the amended complaint remain the same and, as far as the Court can glean, the simple factual amendment should not alter the parties' positions on the pending motion to dismiss.  As such, the Court proceeds with its ruling.

In September 2011, during a project walk through, discoloration was noted around an electrical cover plate in one of the units in the independent living portion of the property. (Am. Compl. ¶ 9.) Further investigation revealed that there was standing water on the exterior side of the vapor barrier in the wall cavity throughout the independent living units and common areas. (*Id.*) It was determined that although the project specifications required the installation of a "smart" vapor barrier, Lend Lease's subcontractor installed a less expensive vapor barrier that lacked the "smart" characteristics of the specified vapor barrier. (*Id.*) This non-specified vapor barrier trapped condensation in the wall, causing water to collect at the wood stud framing and resulting in extensive water damage to the building enclosure throughout the independent living section of the property. (*Id.* at ¶ 10.)

After the water damage was discovered, Friendship Village and Lend Lease conducted an investigation to better understand the reasons behind the water intrusion and to determine how to protect future residents from potential harm stemming from water intrusion. (Am. Compl. ¶ 12.) Friendship Village hired independent expert CTL Consulting, LLC ("CTL") to assist with the investigation, and Lend Lease hired Wiss, Janney, Elstner Associates, Inc. ("WJE"). (*Id.* at ¶¶ 26-27.) Using WJE's computer analysis of the performance of the non-specified vapor barrier, along with its own investigation of the walls, CTL was able to determine the causes of the moisture in the walls, one of which was the installation of the non-specified barrier.[2] (*Id.* ¶ 28.)

---

[2] This was the factual allegation that Friendship was recently granted leave to amend. In its original complaint, Friendship Village alleged that CTL and WJE collaborated to determine that the non-specified vapor barrier was the sole cause of the water intrusion. (Compl. (dkt. 1) ¶ 28.)

The parties were ultimately required to undertake a number of remedial actions to fix the damage to the property, including obtaining the expertise, manpower, and materials to repair the independent living section's electrical components, drywall, heating and cooling units, flooring, window treatments, and carpentry. (Am. Compl. ¶ 13.) The remedial work took several weeks to complete, which further delayed inspection by County officials, as well as resident occupancy. (*Id.* at ¶¶ 13-14, 20-21.)

Separately, Friendship Village has alleged a number of other shortcomings by Lend Lease relating to (1) the frequent breakdown of the condensing units in the building's HVAC system; (2) inadequate cooling to the IT closets and the elevator machine room; (3) frequent burnout of the sequencers in the VTAC units; (4) various National Fire Protection Association Life Safety Code violations; and (5) plumbing piping cracks and dislocation. (Am. Compl. ¶¶ 32-78.)

In its three-count complaint against Lend Lease, Friendship alleges breach of contract (counts I and II) and negligence (count III.) In a "Summary of Damages" section, Friendship lays out the damages it seeks to recover for various expenses, including $368,793.00 for "delayed resident occupancy" and $97,168.67 for "investigation costs," both related to the non-specified vapor barrier. (Am. Compl. ¶ 82.) Friendship also seeks damages for expenses incurred as a result of the other alleged construction defects enumerated above. (*Id.*) Lend Lease now asks the Court to dismiss Friendship's claim for negligence under Rule 12(b)(6), arguing that Illinois law does not permit the recovery of purely economic losses in tort.

II. **Standard on a Rule 12(b)(6) Motion to Dismiss**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the

complaint for failure to state a claim upon which relief may be granted. *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). When ruling on a 12(b)(6) motion to dismiss, the Court accepts all well-pleaded factual allegations as true, drawing all reasonable inferences in plaintiff's favor. *Hecker v. Deere & Co.*, 556 F.3d at 580. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, it must contain enough facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).

## III. Analysis

Lend Lease has asked the Court to dismiss Friendship's claim for negligence, arguing that the "economic loss rule" set forth in *Moorman Manufacturing Co. v. National Tank Co.*, 435 N.E.2d 443, 448 (Ill. 1982), forbids the recovery of purely economic losses in tort.[3] Friendship responds, acknowledging that not all of the damages listed in its summary of damages can be recovered in tort, and seeks leave to amend its complaint to properly reflect this acknowledgment. Friendship continues to maintain, however, that the damages for delayed resident occupancy and investigation

---

[3] In Count III, Friendship does not expressly describe Lend Lease's use of the non-specified barrier as an example of its negligence. Instead, after citing the standard of care set forth in the agreement, Friendship describes the other alleged shortcomings by Lend Lease as negligent. In any event, in light of the position Friendship sets forth in its response, and Friendship's incorporation of all allegations of its complaint into Count III, we will view Count III as a tort claim for negligence that includes Lend Lease's use of the non-specified vapor barrier.

4

costs related to the non-specified vapor barrier are recoverable in tort under an exception to the economic loss rule. The Court disagrees.

In *Moorman*, the Illinois Supreme Court held that a "plaintiff cannot recover for solely economic loss under the tort theories of strict liability, negligence, and innocent misrepresentation." *Moorman*, 435 N.E.2d at 453. The Court described economic loss as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property." *Id.* at 449. The rationale behind the economic loss rule (also known as the *Moorman* doctrine) has been explained as follows:

> In *Moorman*, this court [reasoned] that tort law would, if allowed to develop unchecked, eventually envelop contract law. Contract law serves a vital commercial function by providing sellers and buyers with the ability to define the terms of their agreements with certainty prior to a transaction. Where the duty of a seller has traditionally been defined by contract, therefore, *Moorman* dictates that the theory of recovery should be limited to contract although recovery in tort would be available under traditional tort theories.

*Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 636 N.E.2d 503, 513 (Ill. 1994). The *Moorman* doctrine is not confined to strict liability actions against product manufacturers, but has been extended to other types of cases including actions relating to construction defects brought against architects, builders and developers. *See Collins v. Reynard*, 607 N.E.2d 1185, 1187 (1992) (Miller, J., specially concurring) (collecting cases).

The *Moorman* doctrine is not without exceptions. It will not be applied (1) where the plaintiff sustained damage, *i.e.*, personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately

5

caused by a defendant's intentional, false representation, and; (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions. *In re Chicago Flood Litig.*, 680 N.E.2d 265, 275 (Ill. 1997).

Here, Friendship has not disputed that the damages it seeks are economic in nature. Instead, according to Friendship, it may recover its damages related to the use of the non-specified vapor barrier (the investigation costs and delayed resident occupancy costs) under the "sudden or dangerous occurrence exception" set forth above.[4] In order to apply that exception, "(1) the economic damages must result from a 'sudden, dangerous, or calamitous event,' and (2) the event must also cause 'personal injury or property damage.' " *1324 W. Pratt Condo. Ass'n v. Platt Const. Grp., Inc.*, 936 N.E.2d 1093, 1100 (Ill. App. Ct. 2010) (quoting *In re Chicago Flood Litig.*, 680 N.E.2d at 275-76). Unfortunately, Friendship has failed to satisfy either prong of this exception.

First, the water infiltration caused by use of the non-specified vapor barrier would not be considered a sudden, dangerous, or calamitous event under Illinois law. "The type of harm attendant to a sudden and calamitous event does not flow from disappointed commercial expectations; rather, it arises from hazards peripheral to the product's intended function." *Am. Xyrofin, Inc. v. Allis-Chalmers Corp.*, 595 N.E.2d 650, 657 (Ill. App. Ct. 1992) (internal quotation omitted). "When characterizing an event as sudden and calamitous the focus is upon 'the suddenness of the occurrence of an event...where such occurrence causes personal injury or damage to property external to

---

[4] Again, Friendship has conceded that the remaining categories of expenses set forth in its "Summary of Damages" are not recoverable in tort.

the defective product which exposes a party to an unreasonable risk of injury to himself or his property, rather than the suddenness or length of time within which the defect or cause of the occurrence develops...and manifests itself in the sudden and calamitous occurrence.' " *Id.* (*quoting United Air Lines, Inc. v. CEI Industries of Illinois*, 499 N.E.2d 558, 562 (Ill. App. Ct. 1986)).

Although Illinois courts have at times found water infiltration and resulting mold growth to be a sudden or calamitous occurrence, the circumstances in such cases can be distinguished from those here. For example, in *Muirfield Vill.-Vernon Hills, LLC v. K. Reinke, Jr. & Co.*, 810 N.E.2d 235, 249 (Ill. App. Ct. 2004), the plaintiffs (as assignees of the homeowners) alleged that construction defects led to an excess of moisture into the interior of a home. *Id.* at 239. After abnormally high levels of mold and bacteria were discovered, the homeowners were required to move out of their home and also experienced damages to their personal effects. *Id.* In finding that plaintiffs could recover damages in tort under the sudden and calamitous occurrence exception, the *Muirfield* court acknowledged that although the "mold and bacterial infestation grew gradually,...its manifestation was sudden and calamitous, damaging the [homeowner's] property and requiring them to flee their house or experience the likelihood of personal injury." *Id.* at 249.

Here, on the other hand, no residents were forced to flee their homes or suffered damage to their personal property as a result of the water damage caused by the faulty vapor barrier. In fact, at the time the water infiltration was discovered, the independent living units (and the entire facility for that matter) were unoccupied. As defendant argues, the court's reasoning in *1324 W. Pratt Condominium Ass'n v. Platt Const.*

7

*Group, Inc.*, 936 N.E.2d 1093 (Ill. App. Ct. 2010), is better applied here.  In that matter, a condominium association filed claims against a construction company after faulty construction (and a subsequent storm) led to water infiltration and mold growth in residential units and common areas.  The Court held that the mold outbreak was not a sudden or calamitous occurrence where there were no allegations that residents "were forced out of their homes due to the mold." *Id.* at 1100-01.  The same conclusion is appropriate here where there were no residents even living in the facility at the time of the water infiltration.  In reaching this conclusion, the Court rejects plaintiff's assertion that the potential health risks to future residents and any delayed occupancy transforms the water infiltration into a sudden and calamitous occurrence.  Such speculative allegations are "insufficient to sustain a cause of action in tort." *Id.* at 1101.

More importantly, even if the water damage was considered a sudden or dangerous occurrence, Friendship has not alleged personal injury or damage to other property to satisfy the second prong of the exception.  As Friendship points out, it has alleged that the use of the non-specified vapor barrier caused damage to the building enclosure and other various components of the independent living section of the facility.  But "[m]ere damage to any property is not sufficient; instead, the property must be 'other property' extrinsic from the product itself." *ExxonMobil Oil Corp. v. Amex Const. Co.*, 702 F. Supp. 2d 942, 969 (N.D. Ill. 2010) (citing *Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 763 N.E.2d 428, 436 (2002)); *see also Miller v. U.S. Steel Corp.*, 902 F.2d 573, 576 (7th Cir. 1990) ("Incidental property damage...will not take a commercial dispute outside the economic loss doctrine...").  Here, where Friendship contracted with Lend Lease for the construction of the entire residential facility, not just the vapor

8

barrier, the damage to the building enclosure and other various building components cannot be considered other property under the exception to the *Moorman* doctrine. The investigation and delayed occupancy costs associated with the faulty vapor barrier are pure economic losses that stem directly from Friendship's "disappointed commercial expectations," and which are not recoverable in tort. *In re Chicago Flood Litig.*, 680 N.E.2d at 276; *see also Redarowicz v. Ohlendorf*, 441 N.E.2d 324, 327 (Ill. 1982). As such, plaintiff's claim for negligence cannot stand and is dismissed with prejudice.

## IV. Conclusion

For the reasons set forth above, defendant's motion to dismiss count III is granted. It is so ordered.

**ENTERED:**

_____
**Michael T. Mason
United States Magistrate Judge**

**Dated: March 28, 2016**